**\*E-FILED 6/7/06\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DON CALHOUN, | NO. C 05-03287 RS |
| Plaintiff, | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| NATIONAL MACHINERY LLC, | |
| Defendant. | |

## I. INTRODUCTION

Plaintiff Don Calhoun was injured while operating a machine manufactured by the National Machinery Company ("Old National"), which no longer legally existed at the time of the accident. In this action, Calhoun seeks to recover under a strict liability theory from National Machinery LLC ("New National"), an entity that acquired substantially all of the assets of Old National, and that continues to manufacture and sell the same general product lines. New National moves for summary judgment on grounds that it did not assume liabilities of Old National under any of the principles enunciated in *Ray v. Alad Corp.*, 19 Cal.3d 22 (1977) and its progeny. Specifically, New National contends that because there is no evidence that it *caused* the circumstances under which Old National became insolvent, it cannot be held liable under the new exception created in *Alad* to the usual rule that a successor corporation is not liable for a predecessor's debts.

In opposition, Calhoun concedes by silence that none of the traditional exceptions to the rule of a successor's non-liability are present here. Calhoun argues, however, that the *Alad* exception

1

does apply, or that there is at least a triable issue of fact in that regard. Calhoun contends that the evidence shows that New National in a legally significant sense "caused" the destruction of any remedies Calhoun would have had against Old National.

The law is clear that liability under the *Alad* exception does not exist where the successor purchases the assets in a bankruptcy proceeding that the successor did not cause. Although there was no actual bankruptcy proceeding here, the undisputed facts reveal that New National acquired the assets of Old National under circumstances sufficiently similar to a bankruptcy that it cannot be said that New National contributed to the destruction of Calhoun's remedies against Old National. That being so, and no other basis for liability appearing, New National's motion for summary judgment will be granted.

## II. BACKGROUND[1]

Prior to and during 2001, Old National had been in severe financial distress for an extended period of time. Numerous arrangements for restructuring its debts or business were explored, but in December of 2001, a group of secured creditors declared that Old National was in default on over $33 million in loans. The creditors froze Old National's credit line. As a result, Old National essentially ceased operating, although it maintained a "skeleton crew" to collect accounts receivable and to secure the real property.[2] Although Old National subsequently received a cash infusion through additional loans that allowed it to fill parts order from existing stock, Old National never resumed manufacturing or sales of new machinery, and it was in no position to do so as a result of its insolvency and the actions taken by the secured creditors.

In February of 2002 an entity called NMC Acquisition, LLC. acquired Old National's

---

[1] Calhoun lodged evidentiary objections to certain portions of the Declaration of Robert Foster, submitted in support of defendant's motion. In response, defendant submitted a supplemental declaration and argument sufficient to establish an adequate foundation for the matters declared by Foster, and the objections are overruled. As will appear, however, the Court's analysis does not rely on any statement in the Foster declaration to which an objection was posed, so the issue is largely moot. In particular, Foster's opinion as to the liquidation value of Old National's assets relative to its then outstanding debt is superfluous in light of the other undisputed facts discussed herein.

[2] Calhoun asserts that Old National had shut down its operations during the holiday season in prior years without permanent consequences. Calhoun does not dispute, however, that this shut down occurred under the circumstances described.

existing debt of $33 million-plus for $19 million. All of the $19 million went to Old National's secured creditors; none of it went to Old National itself or to its controlling shareholder. The individuals behind NMC Acquisition apparently included members of the Kalnow family, which had been involved in ownership or management of Old National since the turn of the last century. There is no dispute, however, that members of the Kalnow family did not own a controlling interest in Old National as of 2001.

NMC Acquisition foreclosed on Old National's debt by public sale held on February 26, 2002. NMC Acquisition was the sole bidder at the sale, offering $16 million of the debt it held. NMC Acquisition subsequently transferred the assets of Old National to New National, a wholly-owned subsidiary of NMC Acquisition.

### III. LEGAL STANDARDS

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-324 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he bears the burden of proof at trial. *Id.* at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law . . . .

Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 111 S.Ct. 2419, 2434-35 (1991) (citing *Anderson*, 477 U.S. at 255); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986); *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 630 (9th Cir. 1987). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service*, 809 F.2d at 631. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV.  DISCUSSION

Prior to the decision in *Alad,* the general rule was well established that where a successor corporation purchased the assets of a predecessor, the purchaser would *not* be held to have assumed the seller's liabilities unless "(1) there [was] an express or implied agreement of assumption, (2) the transaction amount[ed] to a consolidation or merger of the two corporations, (3) the purchasing corporation [was] a mere continuation of the seller, or (4) the transfer of assets to the purchaser [was] for the fraudulent purpose of escaping liability for the seller's debts." *Alad*, 19 Cal.3d at 28. In its moving papers, New National establishes that none of these traditional exceptions apply here, and Calhoun does not argue to the contrary in its opposition. Accordingly, the only issue is whether the "new" exception announced by the *Alad* court to the general rule of non-liability is available to Calhoun under the circumstances here.

The "new" exception of *Alad* allows a plaintiff to pursue a tort claim of strict liability against

4

1  a successor manufacturer where justified by "(1) the virtual destruction of the plaintiff's remedies
2  against the original manufacturer caused by the successor's acquisition of the business, (2) the
3  successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of
4  requiring the successor to assume a responsibility for defective products that was a burden
5  necessarily attached to the original manufacturer's good will being enjoyed by the successor in the
6  continued operation of the business." *Id.* at 31.  In creating this exception, the *Alad* court emphasized
7  the "'paramount policy to be promoted by the rule [of strict liability] is the protection of otherwise
8  defenseless victims of manufacturing defects and the *spreading throughout society* of the cost of
9  compensating them.'"  *Id.* (quoting *Price v. Shell Oil Co.* 2 Cal.3d 245, 251 (1970), emphasis added
10  by *Alad* court.)

11  Here, with one important exception, all of the factors considered by the *Alad* court appear to
12  be present–New National is continuing to trade on the goodwill of Old National; only New National
13  is in a position to bear the risks created by the products that were sold to create that goodwill; and
14  even though New National is not a "mere continuation" of Old National in a legal sense, it presents
15  itself to the public very much as the legacy of Old National's century-old business.  Nevertheless,
16  one distinction between this case and *Alad* is critical; Old National was insolvent before New
17  National (or NMC Acquisition) came into existence and acquired its assets.  Thus, New National
18  argues, the destruction of remedies against Old National was *not* caused by anything New National
19  did in acquiring the assets, but by Old National's pre-existing failure to be in a position to continue
20  operating as a going concern.

21  "A causal element has been firmly established in California jurisprudence in the
22  interpretation of *Alad* by the Courts of Appeal."  *Stewart v. Telex Communications, Inc.*, 1
23  Cal.App.4th 190, 198 (1991).  Even though "this causation requirement is not a strict one, and
24  sufficient causation will be found as long as the successor played some role in curtailing or
25  destroying plaintiff's remedies," *id.,* the law appears settled that a bankruptcy is sufficient to break
26  the chain of causation, absent a showing of subterfuge. *Id*. at 200.  In such cases, not only is it
27  apparent that the loss of a plaintiff's remedies resulted from the bankruptcy rather from conduct by
28  the successor, permitting the *Alad* exception would give the plaintiff  "a 'windfall defendant' who

5

would not otherwise be available" and put the plaintiff in a *better* position than he or she was prior to the acquisition.  *Id.*

In this case, of course, Old National never entered actual bankruptcy proceedings.  The circumstances of Old National's insolvency, however, are not in material dispute.  Calhoun cannot show that he still had any meaningful remedy against Old National *prior* to the acquisition. Although Calhoun argues that *Stewart* and similar cases are distinguishable on the grounds that no actual bankruptcy proceedings were held here, neither logic nor good policy would support a rule that protects successors who purchase assets in bankruptcy proceedings but not parties who acquire assets in regularly-conducted public foreclosure sales without resort to court intervention.  In either situation, of course, a successor who has played some role in causing or creating the financial difficulties of the original company will *not* automatically be entitled to take the assets without incurring potential liability under the *Alad* exception.  See, *e.g. Kaminski v. Western McArthur Co.*, 175 Cal.App.3d 445 (1985) (finding *Alad* liability where successor had exercised operational control over predecessor during period business was failing.)  Calhoun has not shown, however, any evidence that such circumstances existed here.

Finally, Calhoun offers a more nuanced distinction suggesting that regardless of whether the asset purchase occurred inside or outside the context of an actual bankruptcy, the critical inquiry is the *identity* of the party that brings about the ultimate disposal of the assets--and that the underlying insolvency, and the causes of that insolvency, are largely or wholly irrelevant.  Thus, Calhoun concedes that if Old National's *original* creditors had foreclosed and caused the public sale at which New National, a third party, had been the successful bidder, there would be no basis for liability even though there was no bankruptcy proceeding.  Nevertheless, Calhoun argues, because it was New National, *not* the original lenders, that actually foreclosed, responsibility for "causing" the destruction of plaintiff's remedies *can* be reasonably ascribed to New National.

As Calhoun recognizes, this argument turns on a premise that despite Old National's undisputed insolvency, Calhoun retained a legally significant chance of obtaining a collectible judgment against it until the asset sale was consummated.  The parties have cited no cases, and the Court has discovered none, with sufficiently similar facts or with sufficient discussion of what

constitutes the destruction of a plaintiff's remedies to provide clear guidance as to what the result should be here.

In the abstract, Calhoun has a valid point: mere insolvency does not necessarily mean that a company will be forever judgment-proof; had the asset sale not gone forward, there was at least a theoretical possibility that Calhoun could have someday enforced a monetary judgment against Old National. For that reason, it would be unwise to create a bright-line rule that there is no liability under *Alad* once the successor proves that the original company became insolvent for reasons unrelated to any conduct of the successor.

Nevertheless, deeming the insolvency of a company wholly irrelevant to the analysis would also be unjustified. While an asset sale might sometimes be seen as the final nail in the coffin, that does not mean that there is always a *meaningful* possibility of recovery before that nail is driven. A rule of law that relied on the *theoretical* possibility, however remote or unlikely, that a company might emerge from insolvency, without consideration of the actual circumstances, would more often than not create a "windfall defendant."

Here, the facts regarding the nature and severity of Old National's insolvency are undisputed. Calhoun has not shown, and cannot show, that there are any facts suggesting that he had any meaningful chance of recovering against Old National prior to the asset sale, or that such a chance would have arisen had the asset sale not gone forward. Rather, Calhoun seeks to create a legal presumption that his remedies were not fully and finally destroyed until New National forced the foreclosure sale. Such a presumption, however, would ignore reality and create a windfall defendant out of a party that indisputably did not cause Old National's insolvency.

V.  CONCLUSION

For the reasons set forth above, and based on the entire record herein, defendant's motion for summary judgment is granted.

IT IS SO ORDERED.

Dated: June 7, 2006

_____
RICHARD SEEBORG
United States Magistrate Judge

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
C 05-03287 RS

8

**THIS IS TO CERTIFY THAT NOTICE OF THIS ORDER HAS BEEN GIVEN TO:**

John P. Cardosi    jcardosi@diemerwhitman.com

Sharon Lynn Hightower    shightower@eakdl.com,

Daniel E Morrison    dmorrison@sachnoff.com, aprice@sachnoff.com; wbrown@sachnoff.com

Jeffrey B. Whitt    jwhitt@sachnoff.com

Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the Court's CM/ECF program.

**Dated: June 7, 2006**                              **Chambers of Judge Richard Seeborg**

                                                     **By:        /s/ BAK**

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
C 05-03287 RS